FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

98 DEC 10 PM 3: 12

|  |  |
|---|---|
| JEFF LANG and BERTHA MEEKS, ) | U.S. DISTRICT COURT |
| as parent and next friend of Jeff Lang ) | N.D. OF ALABAMA |
|  ) |  |
|     Plaintiffs ) |  |
|  ) |  |
|  ) Civil Action Number |  |
| v. ) |  |
|  ) CV-97-PT-2657-E | ENTERED |
| ALABAMA INSTITUTE FOR DEAF ) |  |
| AND BLIND; SYLVESTER JAMES, in his ) | DEC 1 0 1998 |
| individual and official capacity as instructor ) |  |
| for the Alabama Institute for Deaf and Blind; ) |  |
| JOSEPH BUSTA, JR., in his individual and ) |  |
| official capacity as President of the Alabama ) |  |
| Institute for Deaf and Blind; and ERMINEL ) |  |
| LOVE-TRESCOTT, in her individual and ) |  |
| official capacity as Principal of the Alabama ) |  |
| Institute for Deaf and Blind, ) |  |
|  ) |  |
|     Defendants. ) |  |

## MEMORANDUM OPINION

This cause comes to be heard on Defendants' Motions for Summary Judgment against plaintiffs filed

on August 11, 1998.

### I. The Claim

Plaintiffs Jeff Lang ("Lang") and Bertha Meeks ("Meeks") (collectively, Lang and Meeks will be

referred to as the "plaintiffs") have brought suit for damages against Sylvester James ("James"), the Alabama

Institute for the Deaf and Blind ("AIDB'), and two AIDB officials, AIDB President, Dr. Joseph Busta ("Dr.

Busta"), and the Helen Keller School Principal, Dr. Erminel Love-Trescott ("Dr. Trescott") (collectively, AIDB,

Dr. Busta, and Dr. Trescott will be referred to as the "AIDB Defendants"), based upon an alleged sexual assault

that plaintiffs contend was committed by James on October 7, 1995. Plaintiff Lang brought this action through

his mother and next friend, Bertha Meeks, seeking recovery predicated on the torts of "constitutional injury,"

45

negligence/wantonness, outrage, assault and battery, false imprisonment, invasion of privacy and conspiracy/collusion. In the Complaint, plaintiff Meeks also seeks damages both on her own behalf, for loss of consortium, and as "parent and next friend" of Jeff Lang.

## II. Plaintiffs' Factual Allegations

### A. The Alleged Attack

Lang is a blind and mentally retarded twenty-eight year old adult male who alleges that he was, on October 7, 1995, sexually assaulted at his apartment in Talladega, Alabama. Lang maintains that the assailant was defendant James, an employee of the AIDB, where Lang had attended the Helen Keller School from 1984 until he "graduated" in 1992. According to Lang, James entered his Talladega apartment, where Lang lived alone, and sexually assaulted him during the evening of October 7. Lang's deposition testimony indicates that he believes the assault to have occurred at 10:30 P.M. Lang's deposition also states that James, during the assault, anally penetrated Lang with his penis without the benefit of any "cream or jelly", ejaculated, and subsequently performed fellatio on him.

Lang originally met James when Lang was a student and dormitory resident at the Helen Keller School, and claims that the October 1995 incident was not the first time that James had sexually assaulted him. Lang testified that he first became a victim of James' attacks when he began attending the school during the mid-1980's, and that the attacks began when Lang was around the age of fourteen. The attacks, claims Lang, took place in the dormitories of the Helen Keller School, where Lang resided until his early twenties. Plaintiffs claim that Lang told James to stop multiple times, but that James used threats of violence to prevent Lang from telling others about the attacks and continued to sexually assault Lang. These alleged attacks were never reported to AIDB or any other authority, and plaintiffs have produced no evidence, aside from Lang's testimony, to prove that these attacks actually occurred.

As stated above, Lang lived alone at the time of the alleged assault and had graduated from the Helen

Keller School about three years before the October, 1995 incident. Lang does not remember, aside from the alleged assault, anyone from AIDB ever coming to his places of residence after he left the AIDB dormitories. However, plaintiffs contend that AIDB continued to care for Lang following his graduation from the Helen Keller School, taking him to work at the Industries for the Blind, making appointments for him, picking up groceries for him and paying his bills, such as rent, telephone, electricity and water.

## B. The Testimony of Jane Myrick

The plaintiffs, in their response to defendants' motions for summary judgment, present the affidavit of Jane Myrick ("Mrs. Myrick"), whose son, Timothy, is "profoundly mentally retarded" and was a student at the Helen Keller School. Timothy lived, for some period of time, in the same dormitories at the school as Lang. Mrs. Myrick's affidavit concerns events that allegedly took place while Timothy was a resident in the dormitories. She states in her affidavit that, in November of 1994, she noticed scratches and marks on her son after he returned home on a Thursday afternoon. Mrs. Myrick claims that her son was withdrawn and would not talk to her about the injuries. Mrs. Myrick states that she immediately contacted a dormitory aid at the school, who told her that the marks had appeared sometime between the previous Tuesday and Wednesday. Later that evening, Mrs. Myrick claims that her son had diarrhea. When she got Timothy to bathe, Mrs. Myrick claims that he told her that Sly (referring to defendant James) had "broke it to pieces." She interpreted her son's statement to mean "James sexually abused me."

Mrs. Myrick claims that during the latter part of 1994 and the early part of 1995, she spoke with Dr. Busta, Dr. Trescott, and other school employees about Timothy and his "identification of James as having hurt him." Mrs. Myrick states that the defendants "denied knowing anything and performed no internal investigation." Mrs. Myrick claims to have been told that "children would be looked after and kept safe" in the dormitories. Mrs. Myrick states that, upon attempting to report alleged abuses, she was met with "bureaucratic denials and statements calculated to mislead." Plaintiffs present the testimony of Mrs. Myrick for the purpose of showing that AIDB had notice of sexual misconduct at the Helen Keller School and its dormitories. It is the

only such evidence.

## III. Defendants' Arguments in Favor of Summary Judgment

### A. James' Factual Allegations and Arguments Based on the Facts

James argues that, given the weight of the evidence presented in this case, no reasonable person could conclude that James committed the alleged assault. He contends that Lang's claims are implausible and, thus, do not, under the substantial evidence standard, prevent a grant of summary judgment. James stresses, in making his argument, that "[t]he mere existence of some alleged factual dispute between the parties will not defeat summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). He states, citing Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1996), that the standard for the nonmoving party is the standard of "substantial evidence." According to the 11th Circuit, substantial evidence is "[e]vidence of such a quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions." Zaklama v. Mt. Sinai Medical Center, 842 F.2d 291, 295 (11th Cir. 1988) (citing Boeing at 374); Michigan Abrasive Co. v. Poole, 805 F.2d 1001, 1004 (11th Cir. 1986). In Poole, the 11th Circuit outlined the method by which to determine if a nonmoving party has provided substantial evidence. According to the 11th Circuit, courts should:

consider all of the evidence – not just that evidence which supports the nonmover's case – but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes reasonable men could not arrive at a contrary verdict, granting of motions is proper. . . A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better case, nor should they be granted only where there is a complete absence of probative facts to support a jury verdict.

Michigan Abrasive Co. v. Poole, 805 F.2d at 1004.[1]

---

[1] In Williams v. Goldsmith, 4 F.Supp.2d 1112 (M.D. Ala. 1998), the District Court stated:

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

In claiming that the plaintiffs have failed to meet their burden, James points to the results and findings

of the Talladega Police Department's investigation of the alleged assault. The Talladega Police conducted an

investigation of Lang's allegations that included DNA analysis, forensic testing for fluids and trace evidence,

viewing and photographing the crime scene, interviewing of witnesses, review of lab and medical reports,

subpoena of phone records, conversations with other state investigative agencies, including the Attorney

General's office, and investigating similar complaints. The lead investigator concluded, following the

completion of the investigation, that evidence obtained provided "absolutely nothing to corroborate the

allegations of Mr. Lang." The Talladega Police, in conducting their investigation into Lang's allegations, also

spoke with the Alabama Attorney General's office about the similar allegations Mrs. Myrick had made

regarding sexual abuse of her son   The Attorney General, however, had found no evidence of misconduct at

AIDB.

James cites a number of specific areas in which Lang's allegations either lack any supporting evidence

or are completely implausible. First, James highlights the implausibility of Lang's allegations concerning James'

alleged entry into the apartment. Lang described a method of entry which, contends James, is physically

impossible. Lang testified in both his deposition and to the police that he locked both the screen door and the

_____

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as
a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
The party asking for summary judgment "always bears the initial responsibility of informing the district
court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate
the absence of a genuine issue of material fact." Id. at 323, 106 S.Ct. 2548. If the movant succeeds in
demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish,
with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. See
Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991);  see also Fed.R.Civ.P. 56(e). A dispute
of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the
nonmoving party." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986). If the non-movant's response consists of nothing more than conclusory allegations, the court must
enter summary judgment for the movant. See Peppers v. Coates, 887 F.2d 1493 (11th Cir. 1989).

4 F.Supp.2d at 1114-15

front door of his apartment prior to going to bed on October 7, 1995. The screen door had a hook and eye lock that cannot, without the application of physical force to destroy the lock or the screen, be opened from the outside, while the main door had a lock and deadbolt. Lang maintained in both his deposition and police interrogation that he never opened the door for James, but that James somehow forced his way into the apartment. The police, however, never found any signs of a forced entry into Lang's apartment, despite having examined all of the doors and windows in the apartment. Lang's testimony, according to James, leaves no method by which James could possibly have entered the apartment.

James also argues that the physical evidence found both on Lang's person and at the alleged crime scene makes it clear that the assault never occurred. On the morning following the alleged assault, Jeff Lang was taken to the hospital by his friend Mrs. Myrick. Lang arrived at the hospital at about 9:00 A.M. on October 8, 1995, and was examined by an emergency room physician, Dr. Donald Abele, M.D. According to Dr. Abele, Lang claimed to have been anally raped. In his deposition testimony, Lang alleges that he was anally raped without the use of a condom or lubricant. However, following a complete examination of Lang, Abele found no signs of trauma to any part of Lang's body, despite having specifically examined Lang's genital, anal and scrotum areas. According to Dr. Abele, the areas were "unremarkable", meaning that there existed no signs of trauma, bleeding, bruises, cuts or discoloration.

Dr. Abele testified that he could not find any indication, evidence or sign indicating that the alleged rape had occurred and that Lang was, as opposed to most rape victims following a rape, in a "pleasant, jovial" mood. Dr. Abele testified that in his professional opinion, with a reasonable degree of medical certainty, it was unlikely that Lang had been raped. During the examination, Abele and other hospital staff members obtained samples from Lang's person, genital, and anal areas. The samples were prepared as part of a rape kit, which, together with Dr. Abele's report, were given to the Talladega Police.

As stated above, Lang claimed, during his interrogation and during his deposition, that James ejaculated and that no condom was used in the commission of the rape. Lang's pillowcases, bed sheets, pajamas and

underwear were all tested by the Alabama Department of Forensic Sciences. The only semen found was identified as Lang's and was found on the inside front of Lang's briefs. Additionally, the samples taken by the hospital on the morning following the alleged assault failed to reveal any evidence of semen. No foreign bodily fluids were found in Lang's apartment or on his person. Based on the extensive nature of the investigation and the complete lack of evidence in support of Lang's allegations, James maintains that the physical evidence mandates a granting summary judgment in this case.

James also notes that no evidence has been provided to contradict, impeach or in any way call into question the testimony of James' alibi witnesses. According to Lang, the assault commenced at 10:30 P.M. on the evening of October 7, 1995. Lang, in his deposition, claims that he is "sure" of this time, but it is not entirely clear from his testimony that this is the case. James claims that he was not in Talladega on the night of October 7, 1995. James maintains that he was forty-five minutes away, in Birmingham, Alabama at a friend's house, with several other adults present, from 9:30 P.M. until 11:40 P.M. The affidavit of Terrell Buckner supports James's contention. James claims that, upon returning home to Talladega at around 12:45 A.M. with his wife and son, he went to bed. His wife, Monica James, verified his account of the evening and states in her affidavit that she was up watching television until 1:30 A.M. on that night while James slept. James states that there exists no evidence which impeaches or calls into question the affidavits of Mr. Buckner and Monica James and that the affidavits were given to the police shortly after the alleged incident occurred.

James highlights several other facts that make Lang's allegations less plausible. First, two individuals, Mike and Susan McCrary, revealed to the police that Lang admitted to them that he had fabricated the story about the alleged assault at the direction of Bertha Meeks and Jane Myrick. Further weakening Lang's credibility is the fact that, following the October, 1995 incident, Lang reported to the police that James had repeated the same acts on or about January 5, 1996. Again, no evidence was found to support the allegation: James's whereabouts were accounted for by other witnesses during the time of the alleged assault; the crime scene showed no signs of forced entry; and no signs of foreign bodily fluids or fibers were found in the

apartment. Contrary to what he reported to the police, however, Lang, in his deposition, denied that James ever went to his apartment after October 7, 1995. Additionally, claims James, the affidavit of Mrs. Myrick is brought into question by her previous unfounded allegations against AIDB. Mrs. Myrick has, in the past, made numerous complaints regarding alleged sexual abuse at AIDB, all of which have been investigated and none of which resulted in any finding of wrongdoing on the part of AIDB or James. She had, in fact, been previously cautioned by AIDB about making false allegations. Mrs. Myrick's credibility is further weakened by an incident that took place following Lang's allegations in which Mrs. Myrick reported to the police that James had made a threatening phone call to Lang's apartment. The police subpoenaed the phone records from the phone company. The records indicated that only one call was made to Lang's apartment on the night of the supposed call – that call came from Myrick's residence.

### 1. Plaintiffs' Response to James' Argument on the Facts

In addressing James' claim that Lang's accusations are implausible and subject to dismissal, plaintiffs contend that the jury could, in examining the evidence, find in favor of the plaintiffs. Plaintiffs point to the fact that Lang is mentally handicapped and can, therefore, be "easily confused by a trained attorney in a deposition." According to plaintiffs, Lang "would not be required to prove the method of James' entry into [Lang's] apartment for a jury to believe that an entry occurred." Plaintiffs claim that it is entirely possible that Lang, due to fear, allowed James to enter, but then did not want to admit to having done so. Plaintiffs then state that James may have had a key, basing that assertion on the fact that Lang claims, in his deposition, that James had been to his apartment before. The final argument plaintiffs present against James' implausibility assertion focuses on the credibility of the affidavits filed by Monica James and Terrell Buckner. Plaintiffs contend that, despite the willingness of persons to execute an affidavit concerning James' whereabouts on October 7, 1995, the issue is one of fact that should be left to the jury.

The only evidence supporting plaintiffs' basic allegations are found in the affidavits of Jeff Lang and Mrs. Meeks. Mrs. Meeks' assertions are all based on what Lang has told her about the alleged incident. The

accusations made in Mrs. Myrick's affidavit do not involve the abuse allegedly perpetrated on Lang. Plaintiffs have provided no physical evidence in support of their claims. Plaintiffs have also asked the court to consider the fact that Lang himself may have lied in his deposition and to the police when he said he did not let James into the apartment, but to trust the remainder of Lang's testimony.

**B. James' Legal Arguments**

**1. Plaintiffs' Claim for Loss of Consortium and Plaintiffs' Status of Next Friend**

Defendant James contends that Ms. Meeks' consortium claim is unsupported by any theory of recovery under Alabama law. James bases this contention on the fact that Ms. Meeks resides in Troy, Alabama and that Lang has not resided with her for any significant period of time since 1984 when Lang came to Talladega at the age of fourteen (James, at this point, asks the court to take judicial notice of the fact that Troy and Talladega are more than 100 miles apart and that no major highway connects the two cities). Lang has been living and working in Talladega independently since graduating from the Helen Keller School at AIDB in 1992. Additionally, there exists no evidence that Meeks provided any support to her son in recent years.[2]

Defendant James also claims that Ms. Meeks cannot bring a claim as "next friend" of Jeff Lang because Lang is not, in any way, dependent upon her for support. According to James, Alabama Code §6-5-390 (1975) allows the parents of an unemancipated minor child to bring an action on behalf of the child, but does not mention or include non-minor children or children who have been emancipated as parties for whom an action can be brought. James also states that no court has ever applied the statute to an adult child. Further, Jeff Lang

---

[2] According to Williston v. Ard, 611 So.2d 274 (Ala. 1992), "loss of the society of a child as distinguished from the loss of the child's services, cannot form the element of recoverable damages," in a loss of consortium case brought by a mother. Id. N.2, quoting Hannon v. Duncan, 594 So.2d 85, 93 (Ala. 1992). Both Williston and Hannon involved minor children presumably living with their parents. Defendant James admits that he is unable to find any Alabama loss of consortium cases involving an injury to an adult, mentally handicapped child who did not reside with the parent claiming loss of consortium, but reasons that "if the Alabama Supreme Court would not allow a claim based upon loss of consortium for a parent who resided with their child, they would most certainly not allow a claim for the parent of an adult child who did not reside with the parent." James thus maintains that the loss of consortium claim should be dismissed as a matter of law.

is an adult who resides on his own. He has not lived at home for any significant length of time since 1984. The statute, according to James, simply does not apply to Lang.

### 2. Plaintiffs' Response

Plaintiffs respond to James' arguments by agreeing to voluntarily dismiss the consortium claim, but also state that "it is clear from the affidavit of Bertha Meeks that though her son is twenty-eight, he mentally operates on the level of a young child. He is able to live in Talladega because he has personnel of AIDB assisting him for groceries, transportation, doctor visits, bill paying, and other needs." According to the plaintiffs, "common sense would dictate that Lang have a next friend and that it be his closest relative – his natural mother."[3]

### C. Motion to Strike Response and Affidavits

Defendant James has also filed a Motion to Strike Plaintiff's Response to Defendants' Motion for Summary Judgment, claiming that the Response was not filed in a timely manner and that the affidavits filed by the plaintiffs are inadmissible. The timeliness claim arises from the court's August 12, 1998 order requiring plaintiffs to respond to the defendants' motions for summary judgment within ten days. Plaintiffs then requested additional time to respond, which was granted by the court over the objections of the defendants. The court extended the time allowed to file the response until September 10, 1998. According to James, the plaintiffs did not file or serve their response in the time allowed by the court. The plaintiffs, states James, hand delivered their response to James' attorneys' office on September 14, 1998, the week after it was due. Additionally, when James' attorney checked with the courthouse on that same day, the document had yet to be filed with the court.

The plaintiffs' response indicates that the document was mailed to the parties on September 10, 1998. Defendant James claims that such claim is false and that the above facts outline the events that actually took place. James claims that this is not the first time that the plaintiffs have falsely certified service and that this

---

[3] The court will not directly reach this issue. At trial, it will not be necessary to make such a distinction, but by allowing Jeff Lang to sue by next friend, both sides may be procedurally protected.

second breach of Rule 11's truthfulness requirement merits the striking of the response. The court will not strike the plaintiffs' response.

James further claims that the affidavits filed with the response are inadmissible in that they are not based upon personal knowledge, do not set forth matters ordinarily admissible under the Federal Rules of Evidence, and do not show that the person giving the affidavit is competent to testify about the matters contained in it.

The affidavit of Bertha Meeks, claims James, contains and is based solely upon, numerous hearsay statements of Jeff Lang. Similarly, says James, Lang's affidavit utilizes hearsay statements to prove the fact of the matter asserted. Lang's affidavit is also due to be stricken, argues James, because it "contradicts the clear facts previously established in James' motion for summary judgment . . . which were taken from Lang's own deposition." James points to the 11th Circuit's opinion in Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc., 736 F.2d 656 (11th Cir. 1984), stating "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit which contradicts, without explanation, previously given clear testimony." Junkins, 736 F.2d at 657. James claims that "Lang's affidavit, by cleverly omitting clear evidence established in Lang's own deposition (e.g. the fact that James unexplainably traveled through two locked doors, and assaulted him in a manner that would leave, but did not leave, clear medical and forensic evidence) creates an almost believable scenario . . . when, in fact, Lang's own unambiguous descriptions of the events show the alleged events to have been impossible."

James contends that Jane Myrick's affidavit is made up almost entirely of inadmissible hearsay statements. Myrick's affidavit makes it clear, according to James, that she has no personal knowledge of the events she attempts to describe in her affidavit. The statements in Jane Myrick's affidavit that are not hearsay are, argues James, purely speculative in nature and not based on personal knowledge. Because Myrick has not been shown to be an expert in any field relevant to this case and because she does not base the statements in her affidavit on personal knowledge, James claims that she is not competent to testify and that her speculations are

thus inadmissible. James cites a number of statements from her affidavits indicating that they are based either on hearsay or on speculation.

### D. The AIDB Defendants' Factual Allegations

The AIDB Defendants aver that Lang was not a student at AIDB and not under its "care, custody or control" on October 7, 1995, and that the alleged assault took place at a private apartment rented by Lang. The AIDB Defendants claim to have no connection, control or responsibility for the apartment and state that AIDB has never had a responsibility to monitor or supervise Jeff Lang at his private apartment. The AIDB Defendants contend that, because they had no protective relationship with Lang, they could not have violated a duty to Jeff Lang or his mother.

The AIDB Defendants also claim that, prior to October 7, 1995, they had no reason to suspect misconduct by James and that neither Dr. Busta nor Dr. Trescott had received any complaints about James' alleged behavior with Lang as an AIDB employee. In her deposition, Bertha Meeks confirms that she had never complained to anyone at AIDB about James and that she never expressed any complaints or concerns about Lang while he was a student at AIDB. Ms. Meeks also states in her deposition that she, prior to the alleged assault, never complained about sexual abuse or misconduct to anyone at the Alabama Industries for the Blind, where Jeff Lang has worked since November of 1993. The AIDB Defendants further state that there is no evidence of record that the AIDB Defendants had actual or constructive notice of any sexual abuse from any source in any manner.

Like James, the AIDB Defendants point out that the allegations of sexual abuse involving Jeff Lang and James have been investigated by the Department of Human Resources, the Alabama Attorney General, and the Talladega City Police. None of the agencies involved in such investigations have found any evidence to support the claims made by Lang and his mother.

Mrs. Myrick requested the Talladega City Police, DHR and the Alabama Attorney General to investigate AIDB. The AIDB Defendants cooperated with all. Each of the agencies complied with her request

and found no evidence to support any claim of sexual abuse. Plaintiffs, according to the AIDB Defendants, rely solely on the deposition testimony of Mrs. Myrick claiming that, upon attempting to report alleged abuses, she was met with "bureaucratic denials and statements calculated to mislead." Such statements, say the AIDB Defendants, do not constitute facts. The AIDB Defendants stress that, although plaintiffs' argument repeatedly decries the fact that Dr. Trescott did not conduct an investigation following Mrs. Myrick's complaint, Dr. Trescott did report the matter to the DHR as required by law and was, in fact, ordered by the Attorney General not to investigate until the Attorney General completed his investigation. Additionally, Dr. Trescott claims that, even though Mrs. Myrick did make a generalized complaint regarding the bruises her son received, she did not make any specific allegations of sexual abuse to AIDB. Thus, according to the AIDB Defendants, the Institute never had any real reason to suspect or investigate any sexual abuse at the school.

### E. Legal Arguments of the AIDB Defendants

#### 1. Argument of AIDB Defendants Regarding the Federal Claims

According to the AIDB Defendants, the "Plaintiffs have failed to establish the existence of each and every element necessary to establish a §1983 case against the defendants." The AIDB Defendants look to the structure of the 10th Circuit's analysis of the §1983 issue in Gates v. Unified School District, 996 F2. 1035 (10th Cir. 1993), as the basis for their argument. The court in Gates held that "in order to hold a school district (board) liable in a §1983 suit, the plaintiff must establish the existence of a policy adopted by the board or the existence and maintenance of a board custom of failure to receive, investigate or act on complaints of violations of female students' constitutional rights to be free of sexual abuse at the hands of the district's employees. 996 F.2d at 1041. The court went on to hold that, in order to establish a case based on custom, the plaintiff must prove:

1)   the existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the school district's employees;

2)   deliberate indifference to or tacit approval of such misconduct by the school district's policy making officials (board) after notice to the officials of that particular misconduct; and

3)  that the plaintiff was injured by virtue of the unconstitutional acts pursuant to the board's
    custom and that the custom was the moving force behind the unconstitutional acts.

R.L.R. v. Pragne Public School Dist. I-103, 838 F. Supp. 1526 (W.D. Okla. 1993); Gates v. Unified School
Dist. No. 449, 996 F.2d 1035 (10th Cir. 1993).

The AIDB Defendants, relying on the above requirements, claim that the plaintiffs have failed to
establish a §1983 claim based on custom. The AIDB Defendants first maintain that the affidavits and
depositions taken in this case show that AIDB has never exhibited a pattern of misconduct by its employees.
Plaintiffs are thus, according to the AIDB Defendants, unable to fulfill even the first element of their §1983
claim, in that they have failed to show the existence of a continuing, persistent and widespread practice of
misconduct.

The AIDB Defendants also contend that plaintiffs' evidence falls short of establishing deliberate
indifference to or tacit approval by officials of any misconduct. According to the deposition testimony of Drs.
Busta and Trescott, AIDB turns over the investigation of allegations of misconduct to the Department of Human
Resources ("DHR") immediately following the receipt of such allegations. The AIDB Defendants also claim
to have fully cooperated with the police investigation concerning the alleged October 7, 1995 incident. The
police found no evidence to support the allegations. The AIDB Defendants maintain that, based on their
practices concerning allegations of misconduct and their assistance in the immediate, impartial and thorough
investigation of the October 7, 1995 incident, plaintiffs have failed to establish the second element of a custom-
based §1983 claim. Additionally, the deposition testimony of Drs. Busta and Trescott, according to the AIDB
Defendants, clearly establishes the fact that AIDB diligently works to ensure that "the staff at AIDB are
properly trained through programs and seminars regarding sexual abuse," and that AIDB has and continues to
take steps to avoid sexual misconduct at AIDB facilities.

Finally, according to the AIDB Defendants, the plaintiffs cannot prove that Lang was injured by virtue
of unconstitutional acts performed pursuant to the board's custom. The Gates court stated that a custom is

established by "the existence of a pattern of persistent and widespread unconstitutional practices that had become so permanent and well-settled as to have force and effect of law." 996 F.2d at 1042. The AIDB Defendants maintain that the evidence presented by plaintiffs clearly fails to show any such pattern and, consequently, cannot show that such a pattern has become well-settled. Thus, claim the AIDB Defendants, plaintiffs are unable to establish each element necessary to maintain a §1983 case against an institution based on custom. The board, according to the AIDB Defendants, is therefore entitled to a judgment as a matter of law.

### 2. Failure of Plaintiffs' §1983 Claims Against the Individual Officers

Again relying on the reasoning and analysis of Gates, the AIDB Defendants assert that plaintiffs have failed to establish a §1983 claim against the individual defendants, Dr. Busta and Dr. Trescott. According to Gates, the elements that a plaintiff must prove in order to establish a §1983 case against an individual differ slightly form the elements a plaintiff must prove against a school board. The elements a plaintiff must prove to establish and maintain a §1983 claim, as outlined in Gates, are:

1) defendants received notice of a pattern of violations of students' constitutional rights to be free of sexual abuse at the hands of the school district's employees;

2) defendants displayed deliberate indifference to or tacitly authorized the unconstitutional acts;

3) defendants failed to take proper remedial steps; and

4) defendants failure to take remedial steps caused the plaintiff's injury.

Gates v. Unified School Dist. No. 449, 996 F.2d 1035 (10th Cir. 1993). See also: Gebser v. Lago Vista Independent School District, __ U.S. __ (1998) (U.S. S. Ct. No. 96-1866).

The AIDB Defendants claim that the elements outlined above for claims against individuals are applicable to this case. In regards to the first element, the AIDB Defendants state, again, that AIDB and its officials were given no notice of the alleged misconduct of Mr. James prior to October 7, 1995. Although officials were given notice of the fact that at least one child, Timothy Myrick, was allegedly "bruised and scratched" while staying at the school, they claim to have been given no notice of any misconduct surrounding

those injuries. The AIDB Defendants therefore contend that no pattern of violations has been proved.

The deliberate indifference issue, according to the AIDB Defendants, was addressed earlier within the context of the institutional §1983 argument. Again, the AIDB Defendants claim that defendants not only have extensive programs meant to stem sexual abuse, but that they complied and cooperated in every way with the official police investigation of the alleged assault. The AIDB Defendants also assert that plaintiffs have not shown a failure to take remedial steps regarding this matter. Plaintiffs' §1983 claims against Dr. Busta and Dr. Trescott are therefore, according to the AIDB Defendants, due to be dismissed as a matter of law.

### 3. The AIDB Defendants' Arguments Against Plaintiffs' State Law Claims

The AIDB Defendants contend that, with respect to the Plaintiffs' state law claims, they are protected from all claims by both the doctrine of sovereign immunity and the doctrine of discretionary immunity. The sovereign immunity claim stems from Article I, Section 14 of the Alabama Constitution, providing that "the State of Alabama shall never be made a defendant in any court of law or equity." As a state institution charged with the responsibility of supervising public education for the sensory-impaired, the AIDB Defendants claim that AIDB is entitled to sovereign immunity under Article I, Section 14.[4]

The AIDB Defendants also maintain that Dr. Busta and Dr. Trescott are protected by sovereign immunity. The AIDB Defendants cite Milton v. Espy, 356 So.2d 1201 (Ala. 1978) and Gill v. Sewell, 356 So.2d 1196 (Ala. 1978), in which the Alabama Supreme Court held that the sovereign immunity granted by the Alabama Constitution extends to officials of the State and its agencies, in both their representative and individual capacities, when interests of the State would be directly affected by a result favorable to the plaintiff, or when the plaintiff, by naming the individual, is attempting to circumvent Section 14. Milton v. Espy, 356 So.2d at 1202; Gill v. Sewell, 356 So.2d at 1198. The Gill court identifies the relief demanded and the nature

_____

[4] Apparently AIDB does not make an Eleventh Amendment immunity argument. The court does not reach that issue. See Quern v. Jordan, 440 U.S. 332, 342 (1979). Also see Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989) as to whether AIDB is a suable "person" under §1983.

of the suit as two factors significant in determining whether an action against a State official is in essence one against the State. 356 So.2d at 1198. According to the AIDB Defendants, the plaintiffs' claims are not directed at Dr. Busta and Dr. Trescott as individuals, but rather at the offices they hold and the performance of their duties as officials at the Helen Keller School. AIDB Defendants thus claim that the president and principal are named solely for the purpose of circumventing the provisions of Section 14. Essentially, the AIDB Defendants maintain that all of plaintiffs' claims are focused on the AIDB as a corporate entity and the actions taken or omitted by individuals as official representatives of that corporate entity. The AIDB Defendants also contend that any money judgment awarded to the plaintiffs would "clearly affect the interest of AIDB." Finally, according to the AIDB Defendants, the plaintiffs' claims allege, at most, negligence on the part of Dr. Busta and Dr. Trescott in the performance of their official duties. Such claims, state the AIDB Defendants, are, under cases such as Gill, barred by sovereign immunity. 356 So.2d at 1198.

As stated above, the AIDB Defendants also contend that the individual defendants are immune from suit based on the doctrine of discretionary immunity as set out in the Restatement (Second) of Torts, §895 D, Public Officers (1974). The doctrine has been adopted by Alabama courts and, according to the AIDB Defendants, acts to shield Dr. Busta and Dr. Trescott from liability in this case, both in their representative and individual capacities. The doctrine holds that public officials and employees are immune from liability while acting "within the general scope of their authority in performing functions that involve a degree of discretion." Woods v. Wilson, 539 So.2d 224, 225 (Ala. 1988); Grant v. Davis, 537 So.2d 7, 9 (Ala. 1988); Barnes v. Dale, 5309 So.2d 770, 784 (Ala. 1988).

The AIDB Defendants rely heavily upon Nance By and Through Nance v. Matthews, 622 So.2d 297 (Ala. 1993), in contending that discretionary immunity applies to Dr. Busta and Dr. Trescott in this case. In Nance, the court, in deciding whether school officials were afforded immunity from claims based on negligent supervision, found that "the exercise of such (training and supervisory) functions is, for the most part, discretionary in nature, and to that extent, affords [the defendant supervisor] substantive [or qualified] immunity

Page -18-

from suit." Nance, 622 So.2d at 301 (quoting Phillips v. Thomas, 555 So.2d 81, 85 (Ala. 1989). According to Nance, supervisory duties, even if affirmative in nature, require constant decision making and judgment on the part of the supervisor and are thus discretionary. The AIDB Defendants therefore claim that Plaintiffs' negligent supervision claims are barred by discretionary immunity.[5]

The plaintiffs have also alleged injuries resulting from the negligent employment of James by the AIDB Defendants. The AIDB Defendants respond that even if evidence of such negligence existed, the AIDB Defendants are immune from such a claim in that the hiring, retaining and terminating of school employees involves discretionary decision making. The AIDB Defendants base their assertion on cases such as Nance and Hickman v. Dothan City Bd. of Educ., 421 So.2d 1257 (Ala. 1982). In Nance, the plaintiff alleged that the

---

[5]

Alabama sovereign immunity and discretionary immunity law is summarized by the Alabama Supreme Court in Ex Parte Warden Leoneal Davis and Deputy Warden Charles Boutwell, 1998 WL 560244, (Ala.) (not yet ready for publication):

> We note that Article I, §14, of the Alabama Constitution of 1901, provides "[t]hat the State of Alabama shall never be made a defendant in any court of law or equity," and that this sovereign immunity extends to State employees acting within the general scope of their authority in performing functions that involve a degree of discretion. McDuffie v. Roscoe, 679 So.2d 641 (Ala.1996). "Discretionary acts" are defined as "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." Wright v. Wynn, 682 So.2d 1, 2 (Ala.1996). To claim the benefit of sovereign immunity, a defendant State employee has the burden of establishing that the plaintiff's claims arise from the employee's performance of discretionary functions for the State. Wright, 628 So.2d at 2. However, a State officer or employee is not protected by discretionary immunity if in performing his discretionary functions he willfully, maliciously, fraudulently, or in bad faith injures someone. Barnes v. Dale, 530 So.2d 770 (Ala.1988). Once a defendant demonstrates that a plaintiff's claims arise from the defendant's performance of a discretionary function, the burden then shifts to the plaintiff to establish that the defendant acted in bad faith or with malice or willfulness, in order to deny the defendant discretionary immunity from suit. Wright v. Wynn, supra. The applicability of the doctrine of discretionary function must be determined on a case-by-case basis, and it is a question of law to be decided by the trial court. McDuffie v. Roscoe, supra. A petition for a writ of mandamus is the proper means for achieving appellate review of a trial court's denial of absolute and discretionary-function immunity. Ex parte Wanger, 709 So.2d 455 (Ala.1997).

Excerpt from page *3.

school board was negligent in retaining a special education aide for employment. The court held that the decision was discretionary in nature and that the board was protected by qualified immunity. In Hickman, the court found that the decision not to retain a teacher for the next school year was a discretionary function and, thus, dismissed a plaintiff school teacher's claim against the school board for negligently relying on an incorrect evaluation in making its decision. Because the AIDB Defendants were exercising a discretionary function in determining whether or not to hire and retain Mr. James, the AIDB Defendants claim that the plaintiffs' claim of negligent hiring is meritless and that the AIDB Defendants are entitled to a judgment as a matter of law.

Plaintiffs, in addition to claiming negligent supervision and negligent hiring on the part of the AIDB Defendants, have claimed that the AIDB Defendants supervised James in a wantonly deficient manner. The AIDB Defendants contend, based on Hill v. Allen, 495 So.2d 32 (Ala. 1986), that they are, despite the wantonness claim, entitled to immunity under the doctrines discussed above. In Hill, the Alabama Supreme Court extended discretionary immunity to include immunity from allegations against state officials sued in their individual capacities of wanton conduct when there existed no evidence of fraud or bad faith on the part of the state officials. The AIDB Defendants believe that the holding in Hill applies directly to this case.

#### 4. Plaintiffs' Response

In responding to the AIDB Defendants qualified and discretionary immunity claims, plaintiffs look to Donahoo v. State, 479 So.2d 1188 (Ala. 1985), and Unziker v. State, 346 So.2d 931 (Ala. 1977), holding that the doctrine of discretionary immunity protects members, the superintendent and principals from liability under state law claims for alleged failure to take action when the complaint does not allege any fraud or bad faith by the defendants. Plaintiffs attempt to distinguish this situation from that of Donahoo and Unziker by alleging that this case involves a bad faith or fraud claim. Plaintiffs argue that this case falls into the exception noted by the Alabama Supreme Court because, in Paragraph 20(e) of their Complaint, plaintiffs allege that AIDB officials met complaints of employee misconduct with "bureaucratic denials and statements calculated to mislead the public and parents of handicapped children served by the [AIDB], and failing to warn same that their

children were at risk." Plaintiffs also point out that under McMillan v. Johnson, 88 F.3d 1554 (11th Cir. 1996), a defendant who acts with malice, intent, or bad faith cannot claim discretionary immunity. McMillan, 88 F.3d at 1572. The plaintiffs then argue that reasonable persons could conclude that Dr. Busta and Dr. Trescott acted with intent, maliciousness, or bad faith in "an attempt to perform or conceal the harm caused to Jeff Lang." Essentially, Plaintiffs argue that a jury could conclude that the officials, by acting in some sort of malevolent manner, were acting outside the line and scope of their authority in dealing with the accusations.

In addressing the AIDB Defendants' federal assertions, plaintiffs first point out that Gates is a 10th circuit decision and that the law, as stated by the 10th Circuit is not controlling on courts of the 11th Circuit. Plaintiff then proceeds to examine the elements of proof outlined in several of the §1983 cases adjudicated by the Alabama Supreme Court and the 11th Circuit. The first case relied upon by Plaintiffs is C.B. v. Bobo, 659 So.2d 98 (Ala. 1995). In Bobo, students and parents brought an action against a teacher, the superintendent, the principals and school board member, all in both their official and individual capacities, for the teacher's alleged sexual abuse and assault and battery of students. The plaintiffs in Bobo alleged negligence/wantonness on the part of school officials in allowing the teacher access to the students and in supervising the teacher. The plaintiffs also alleged constitutional violations based on the students' liberty interest in bodily integrity. Because the complaint did not allege bad faith or fraud, the Alabama Supreme Court dismissed all of the state claims against all of the defendants except the teacher based on the doctrine of discretionary immunity.

The Bobo court, however, found that the students' complaints stated a §1983 claim. The court looked to the 5th Circuit's language in Doe v. Taylor Independent School District, 15 F.3d 443 (5th Cir. 1994) cert. denied, Lankford v. Doe, ___ U.S. ___, 115 S.Ct. 70 (1994), stating that the plaintiff's "substantive due process claim is grounded upon the premise that school children have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment and upon the premise that physical sexual abuse by a school employee violates that right. . . If the Constitution protects a school child against being tied to a chair or against arbitrary paddlings, then surely the Constitution protects a schoolchild from physical abuse.

.. by a public school teacher... It is incontrovertible that bodily integrity is necessarily violated when a state actor sexually abuses a schoolchild and that such misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment. Obviously, there is never any justification for sexually molesting a schoolchild, and thus, no state interest, analogous to the punitive and disciplinary objectives attendant to corporal punishment, which might support it." Bobo, at 103, 104, quoting Taylor, at 450,451, 453. The Alabama Supreme Court thus concluded that the children in Bobo had been deprived of a constitutional right and that they were entitled to bring a §1983 claim.

The Bobo court also pointed out that its decision on the Rule 12(b)(6) motion did not, in any way, answer the question of whether the students could or would prevail on the merits of the §1983 claim. The court stated that, in order to determine the personal liability of the defendants for the teacher's abuse, the students had to establish that the defendants, by action or inaction, "demonstrated deliberate indifference toward the student plaintiffs' constitutional rights and thereby proximately caused the violation of those rights," Bobo, at 104.

Plaintiffs also argue that the 11th Circuit's decision in Spivey v. Elliott, 29 F.3d 1522 (11th Cir. 1994), is relevant in this case. In Spivey, claims were brought against officials of a Georgia-operated residential school where a student was allegedly assaulted by a classmate. The panel majority determined that a special relationship existed between the student and the state, through its institution, and that the state, therefore, had a constitutional duty to protect the student. The court related the special duty to that owed by the state to incarcerated prisoners and to involuntarily committed mental patients as established in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285 (1976), and Youngberry v. Romeo, 457 U.S. 307, 102 S.Ct. 2452 (1982). The court, in determining that a special relationship existed, held that the plaintiff's status as a resident student was the distinguishing factor between the situation in Spivey and previous cases holding that compulsory school attendance did not create a special relationship such that the state had a duty to protect the students from violence. The court pointed out that the student in the residential school setting relied on the state for the provision of his everyday needs, as opposed to those students attending ordinary compulsory education classes,

who returned home each day, and whose parents controlled their receipt of basic needs. The degree of dominion and control the state wields over residential students, because of the provisions of the students' daily needs, according to the court, was enough to create a special relationship. However, after establishing the existence of a special relationship, the court affirmed summary judgment on the ground that the plaintiffs had not shown that the defendants had violated any clearly established rights.

The plaintiffs emphasize that Spivey dealt with behavior and actions that took place prior to 1988 and that, since that time, several cases have been decided that appear to establish a cause of action in cases such as this one. The plaintiffs focus on Stoneking v. Bradford Area School District, 882 F.2d 720 (3rd Cir. 1989), Bobo, and Davis v. Monroe County Board of Education, 74 F.3d 1186 (11th Cir. 1996). In Stoneking, the court held that officials were not entitled to qualified immunity from liability in a civil rights action brought by a former student when there existed evidence that the principal and assistant principal discouraged and minimized reports of sexual misconduct by teachers. In Bobo, the court held that the violation of a right existed for activities that took place no later than 1993, as that was the year the case was filed and cited Doe v. Taylor, which was ruled on in 1994. Finally, in Davis, students stated a Title IX claim against a school board based on the environment caused by the sexual misconduct of other students. The actions took place in December of 1992 and May of 1993. The plaintiffs thus conclude that, because the Davis court allowed a claim involving negligent supervision that took place in 1992 and 1993, reasonable persons in Dr. Busta's and Dr. Trescott's positions should have known that by failing to stop the alleged abuse in 1995, they were violating a law. Plaintiffs contend that the depositions of Dr. Busta and Dr. Trescott indicate deliberate indifference to the allegations of sexual misconduct. According to the plaintiffs, Mrs. Myrick's communications with them should satisfy the notice requirement. The causation element, state the plaintiffs, is fulfilled by the defendants' denying that Mrs. Myrick ever notified them of the abuse and by their having failed to take any internal actions to preclude further abuse. Thus, the plaintiffs contend that summary judgment is not proper under the present circumstances.

## IV. Conclusions of the Court

### A. Federal Claims Against the AIDB Defendants

Plaintiffs have attempted to relate this case to the situation involved in cases such as <u>Spivey</u> and <u>Bobo</u>. They have, in essence, asked the court to recognize a special relationship between the AIDB and Lang akin to that recognized in <u>Spivey</u> and to recognize the validity of their claim as the court did in <u>Bobo</u>. However, the recognition given to the constitutional claims in <u>Spivey</u> and <u>Bobo</u> is easily distinguishable from the present situation.

In <u>Spivey</u>, the 11th Circuit recognized a special relationship between a hearing-impaired eight year old boy and the State-run residential school upon which he relied for the basic necessities of life. The relationship between the boy and the school established a relationship that, in turn, triggered a duty to on the part of the state, to protect the student from harm.

The Supreme Court has recognized a special relationship in the context of a state's duty to provide adequate care to incarcerated prisoners, reasoning that because the prisoner is unable "by the reason of the deprivation of his liberty [to] care for himself," it is only "just" that the state be required to take care of him. <u>Estelle v. Gamble</u>, 429 U.S. 97, 97 S.Ct. 285 (1976). In holding that a state also owes a duty of protection to involuntarily committed mental patients, the Supreme Court ruled that the patient has a liberty interest to be protected substantively under the due process clause and that a state is required to provide the patient with "reasonable safety," and "adequate food, shelter, clothing and medical care." <u>Youngberg v. Romeo</u>, 457 U.S. 307, 102 S.Ct. 2452 (1982). The 11th Circuit has, in addition to recognizing that a state owes a duty of protection to handicapped students at a state-run residential school, recognized a liberty interest in the case of a child who is involuntarily placed in a foster home. <u>Taylor v. Ledbetter</u>, 818 F.2d 791 (11th Cir. 1987), cert. denied, 489 U.S. 1065, 109 S.Ct. 1337 (1989).

According to <u>Spivey</u>, the 11th Circuit, and all but one of the other circuits considering the issue, have, however, limited their recognition of special relationships to situations where a person is subject to the control

of the state and is subject to the full-time care of the state. Courts have generally not extended the special

relationship doctrine to include all students attending schools of a state as a result of the state's compulsory

education laws. See Maldonado v. Josey, 975 F.2d 727, 732-33 (10th Cir. 1992) (boy unsupervised for 20

minutes caught in his bandana and strangulated ), cert. denied, 507 U.S. 914, 113 S.Ct. 1266 (1995); D.R. By

L.R. v. Middle Bucks Area Vo Tech School, 972 F.2d 1364, 1371 (3rd Cir. 1992) (female students sexually

molested by several male students), cert. denied, 506 U.S. 1079, 113 S.Ct. 1045 (1993); J.O. v. Alton

Community Unite School Dist. 11, 909 F.2d 267, 272 (7th Cir. 1990) (student sexually molested by teacher).

These courts reasoned that compulsory school attendance laws do not impose a complete and ultimate

responsibility on the state for the care of its students. Id.; cf. Doe v. Taylor Independent School Dist., 15 F.3d

443 (5th Cir. 1994). The Spivey court distinguished the ordinary compulsory education cases from the case

of a residential student, stating:

> Each of those cases involved a day school situation where the students attended school for a set number
> of hours and returned home to the supervision of their parents and the protection of their homes at the
> end of the day. Thus, it was still the children's parents who had ultimate control of their basic needs
> on a daily basis. [The student] could not go home at the end of the day. [He] had only the State upon
> which to rely for his food, shelter, and safety during the school week. . . A hearing impaired boy only
> eight years old necessarily depends upon the adults with whom he resides for his care. If the State did
> not tend to [the student's] basic needs while he resided at the school, those needs would go unmet.

Spivey, at 1525-26. The Spivey court further analyzed the extent of student dependency and state control

necessary to create a special relationship in finding:

> Whether the plaintiff willingly enters state custody is not determinative. The question is not
> so much how the individual got into state custody, but to what extent the State exercises dominion and
> control over that individual.
> This type of analysis is contemplated by the Supreme Court in DeShaney v. Winnebago County
> Dept. of Social Services, 489 U.S. 189, 109 S.Ct 998 (1989). . . "It is the State's affirmative act of
> restraining the individual's freedom to act on his own behalf – through incarceration, institutionalization
> or other similar restraint of personal liberty . . . that triggers the protections of the Due Process Clause
> . . ." DeShaney, at 200.

Spivey, at 1526.

Plaintiffs in this case claim that AIDB provided Lang with a number of services aimed at helping him

to attain the basic necessities of life. AIDB employees allegedly shopped with him, helped him pay his bills, took him to appointments, provided him with transportation to and from work, and were available to aid him in other areas when necessary. However, plaintiffs do not provide any reason to conclude that AIDB was responsible for Lang's safety at his apartment, where he lived alone without the aid of AIDB employees. In effect, he had access to social workers, unrelated in their work to James and without residential custodial obligations. Plaintiffs admit that, prior to the alleged incident, Lang was never visited at his apartment by any AIDB employee and received no personal care from AIDB employees. Lang was a handicapped adult who supported himself financially and lived on his own. The state did not exercise dominion and control over him to the extent that he would have a protectable liberty interest any greater than that afforded to other citizens who may also be provided special governmental services. Although, under Spivey, the State probably did owe him a higher duty of care while he resided at the dormitories of the Helen Keller School, that duty terminated when Lang "graduated" the school and went off to live independently.

The analysis under Bobo is similar. According to Bobo, to state a claim under S 1983, a plaintiff must allege facts constituting a deprivation of a constitutional right under color of state law. Bobo, 659 So.2d at 102; 42 U.S.C. 1983. Cases such as Bobo and Spivey, recognizing claims against school boards and school officials for the sexual misconduct of other students or school employees and recognizing a duty on the part of the state to protect students only involve students who were, at the time of the alleged violations, in the care of the state. Otherwise, the state cannot be said to have proximately caused the injury.

Plaintiffs have also failed to show that James acted under color of state law when he allegedly committed the assault in October of 1995. James' alleged independent actions at Lang's apartment, where no AIDB employee had ever visited, certainly cannot be and could not have been mistaken for state action. Even if James did commit the alleged assault, he certainly did not do so within the line or scope of his employment and did not do so under color of state law or authority. James was not working, was not at his place of employment, was not on his way to work, and did not represent that he was appearing in his capacity as a State

employee when the alleged incident took place. The federal claims against the AIDB Defendants will be dismissed for several reasons.

First, as to the more recent alleged incident, there was no state action and no acting under color of state law. Further, there was no substantial notice to the AIDB defendants, assuming any responsibility, of any alleged conduct of James outside a teacher-student relationship. The AIDB defendants appropriately addressed earlier complaints and reasonably relied on reports of state officials. No AIDB defendant is alleged to have been a participant. No individual defendant should have known that he was violating clearly established law. As to any alleged earlier incidents involving Myrick, the AIDB Defendants took appropriate investigative action.

### B. State Law Claims Against AIDB Defendants

The plaintiffs do not allege that AIDB, Dr. Busta and/or Dr. Trescott knew about, ordered or took any active part in the alleged assault. Plaintiffs thus have no claim against the AIDB Defendants under state law. Furthermore, plaintiffs have failed to produce any admissible evidence in relation to their claim that the AIDB Defendants exercised wilfulness, malice or bad faith in reacting to the claims made by Mrs. Myrick or any other person. Both AIDB and its officers would therefore enjoy either sovereign or discretionary immunity protection even if state action was involved.

### C. Plaintiffs' Claims Against James

With respect to the claims against James, it is important to remember that on a motion for summary judgment, the court must assess the proof to ascertain whether there is a genuine need for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate only if this court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing this court of the grounds for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes

demonstrate the absence of a genuine issue of material fact. Id. at 323. Once the moving party has met this burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there exist genuine issues for trial. Celotex, 477 U.S. at 324; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). The court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any..." in deciding whether to grant or deny a summary judgment motion. Fed. R. Civ. P. 56(c). In resolving whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the looking glass of the substantive evidentiary burden. Anderson, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 919 (11th Cir. 1993). However, incomplete or anecdotal evidence will not aid the non-movant in demonstrating a genuine issue of material fact. "The nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" Tidwell v. Carter Products, __ F.3d __, 1998 WL 80143 at *3 (citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir.1989)).

In light of the above, this court must canvass the evidence to determine if there is a genuine issue of material fact. Although James has presented a significant amount of evidence in support of his assertion that the attack could not have occurred in the manner described by Lang and that the attack did not actually occur at all, the court, as stated above, is not in a position to weigh the value and credibility of the testimony and

evidence James has presented against the value and credibility of Lang's deposition and affidavit testimony. Lang's testimony is, of course, allegedly based on his personal knowledge and experiences. The essence of his testimony is that James sexually assaulted him. It may not be impossible for a jury to determine that his status as a mentally-retarded individual caused his testimony to be somewhat distorted as to the details but truthful as to the essence of the claim. Although the evidence provided by the plaintiffs is questionable, the court concludes there is an issue of fact as to the claims against James.

The court concludes, however, that there is no federal claim against James for the alleged October 1995 incident. James would not have been a state actor acting under color of state law. As to the alleged earlier claims, James would have likely been a state actor acting under color of state law. As to those claims, however, there is a significant statute of limitations issue. Both the appropriate state limitations period and the state tolling provisions apply to the determination of the issue. See Dukes v. Smitherman, 32 F.3d 535, 536 (11th Cir. 1994); Whitson v. Baker, 755 F.2d 1406, 1409 (11th Cir.1985) . The issue is whether the statute of limitations has been tolled because Jeff Lang is "insane." See §6-2-8(a), Ala. Code 1975 ("If anyone entitled to commence any of the actions enumerated in this chapter ... is, at the time such right accrues, below the age of 19 years, insane or imprisoned on a criminal charge for any term less than for life, he shall have three years, or the period allowed by law for the commencement of such action if it be less than three years, after the termination of such disability to commence an action...."); Travis v. Ziter, 681 So.2d 1348, 1352-1353 (Ala. 1996) (recognizing statutory provision for the tolling of the statute of limitations in cases of insanity, but refusing to extend insanity tolling provision to include repressed memories); Alabama Power Co. v. Shaw, 215 Ala. 436, 111 So. 17 (1926) (decided under insanity tolling provision of §8960, Ala. Code 1923). The underlying issue is whether a severely mentally retarded person with a low mental age is "insane" such that the statute of limitations is indefinitely tolled as to such a person. The court will certify that issue to the Supreme Court of Alabama.

Page -29-

If it is determined that the statute of limitations has not been tolled as to the earlier claims, the court will

dismiss any federal claim(s) against James, with prejudice, and will dismiss the state claims without prejudice.

Done this ___ day of December, 1998.

ROBERT B. PROPST
UNITED STATES DISTRICT JUDGE